**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

THOMAS SAXTON, IDA SAXTON,
BRADLEY PAYNTER,

                 Plaintiffs,

 vs.

THE FEDERAL HOUSING FINANCE
AGENCY, in its capacity as Conservator of the
Federal National Mortgage Association and the
Federal Home Loan Mortgage Corporation,
MELVIN L. WATT, in his official capacity as
Director of the Federal Housing Finance
Agency, and THE DEPARTMENT OF THE
TREASURY,

                 Defendants.

No. 1:15-cv-00047

**PLAINTIFFS' COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF AND DAMAGES**

Thomas Saxton, Ida Saxton, and Bradley Paynter, by and through their undersigned

counsel, hereby allege as follows:

**I.**
**INTRODUCTION**

1.     In August 2012, at a time when the housing market was recovering from the

financial crisis and the Federal National Mortgage Association and the Federal Home Loan

Mortgage Corporation (respectively, "Fannie" and "Freddie," and, together, the "Companies")

had returned to stable profitability, the federal government took for itself the entire value of the

rights held by Plaintiffs and Fannie's and Freddie's other private shareholders by forcing these

private, shareholder-owned Companies to turn over **all** of their profits to the federal government

on a quarterly basis **forever**—an action the government called the "Net Worth Sweep." Plaintiffs

1

bring this action to put a stop to the federal government's naked and unauthorized expropriation of their property rights.

2.    At the time of the financial crisis in 2008, Fannie and Freddie were two of the largest privately owned financial institutions in the world. They owned and guaranteed trillions of dollars of assets, mostly mortgages or mortgage-backed securities. The Companies operated for profit, and their debt and equity securities were privately owned and publicly traded. The Companies' shareholders included community banks, mutual funds, insurance companies, pension funds, and countless individuals.

3.    Fannie and Freddie had been consistently profitable for decades prior to 2008. However, like many large financial institutions exposed to the U.S. residential mortgage market in 2008, the Companies faced write-downs in the book value of their assets and a loss of investor confidence in the mortgage market broadly.

4.    In reaction to growing concerns about Fannie and Freddie, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"). HERA created the Federal Housing Finance Agency ("FHFA") to replace Fannie and Freddie's prior regulator and authorized FHFA to appoint itself as conservator or receiver of the Companies in certain statutorily specified circumstances. As conservator, HERA charges FHFA to rehabilitate Fannie and Freddie by taking action to put the Companies in a sound and solvent condition while preserving and conserving their assets. Only as receiver does HERA authorize and direct FHFA to wind up the affairs of Fannie and Freddie and liquidate them. HERA's distinctions between the authorities granted to conservators and receivers are consistent with longstanding laws and practices of financial regulation.

5.     HERA granted The Department of the Treasury ("Treasury") temporary authority to invest in the Companies' stock until December 31, 2009. Congress made clear that in exercising this authority Treasury was required to consider the need for Fannie and Freddie to remain private, shareholder-owned companies.

6.     These limitations on FHFA's and Treasury's authority make clear that Congress did not intend for the agencies to operate Fannie and Freddie in perpetuity, or at all, for the exclusive financial benefit of the federal government.

7.     On September 6, 2008, FHFA placed Fannie and Freddie into conservatorship. James Lockhart, the Director of the FHFA, emphasized that the purpose of the conservatorship was to "restore confidence in" and "stabilize" the Companies "with the objective of returning [them] to normal business operations." Director Lockhart also indicated that the conservatorship would be temporary, stating that FHFA would only "act as the conservator to operate the [Companies] until they are stabilized."

8.     Immediately after the Companies were placed in conservatorship, Treasury exercised its temporary authority under HERA to enter into agreements with FHFA to purchase securities of Fannie and Freddie ("Preferred Stock Purchase Agreements" or "PSPAs"). Under these PSPAs, Treasury committed to purchase a newly created class of securities in the Companies, known as Senior Preferred Stock ("Government Stock"), at the request of the Companies as and when necessary for the Companies to maintain a positive net worth. In return for its commitment to purchase Government Stock, Treasury received $1 billion of Government Stock in each Company as a commitment fee and warrants to acquire 79.9% of the common stock of the Companies at a nominal price.

3

9.     The Government Stock entitled Treasury to dividends at an annualized rate of 10% if paid in cash or 12% if paid in kind.  The Government Stock was entitled to receive cash dividends from the Companies only to the extent declared by the Board of Directors "in its sole discretion, from funds legally available therefor."  If the Companies did not wish to—or legally could not—pay a cash dividend, the unpaid dividends on the Government Stock could be capitalized (or paid "in kind") by increasing the liquidation preference of the outstanding Government Stock—an option Treasury expressly recognized in the fact sheet it released upon entry into the PSPAs. Therefore, the Companies were never required to pay cash dividends on Government Stock.  And there was never any threat that the Companies would become insolvent by virtue of making cash dividend payments, both because dividends could be paid with stock and because state law prohibits the payment of dividends if it would render a company insolvent.

10.     The Government Stock diluted, but did not eliminate, the economic interests of the Companies' private shareholders. The warrants to purchase 79.9% of the Companies' common stock gave Treasury an "upside" in the event the Companies were rehabilitated, but this upside would be shared with preferred shareholders (who had to be paid before any payment could be made on common stock purchased with Treasury's warrants) and common shareholders (who retained rights to 20.1% of the Companies' residual value). Director Lockhart accordingly assured Congress shortly after imposition of the conservatorship that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest.

11.     Under FHFA's supervision—and, on information and belief, at the insistence of Treasury—the Companies excessively wrote down the value of their assets. This resulted in large paper losses at the Companies. By June 2012 FHFA and Treasury had forced Fannie and Freddie

to issue $161 billion in Government Stock to make up for the balance-sheet deficits caused by the government's overly pessimistic accounting decisions, even though there was no indication that the Companies' cash expenses could not be met by their cash receipts. Treasury purchased an additional $26 billion of Government Stock so that Fannie and Freddie would have enough money to pay Treasury cash dividends even though, as explained above, the Companies were not required to pay cash dividends. Because the amounts borrowed to cover these paper losses and to pay cash dividends could not be repaid, the amount of dividends owed on the Government Stock was artificially inflated by the Companies having been forced to take capital from Treasury that they did not need to pay their expenses.

   12. As a result of these investments, Treasury owned a total of $189 billion of Government Stock. But based on the Companies' performance in second quarter of 2012, it was apparent that there was still value in the Companies' private shares. By that time, the Companies were demonstrably solvent and paying 10% annualized cash dividends on the Government Stock without drawing additional capital from Treasury. And based on the improving housing market and the high quality of the newer loans backed by the Companies, it was apparent that they had returned to stable profitability. This return to profitability made it inevitable that the Companies would be reversing many of the paper losses they had incurred under FHFA's supervision, and the reversal of those paper losses would result in massive profits. Given the broad-based recovery in the housing industry that had occurred by the middle of 2012, the government fully understood that the Companies were on the precipice of generating huge profits, far in excess of the dividends owed on the Government Stock. Moreover, by the time of the Net Worth Sweep in August of 2012, the financial crisis had passed, and there was no need for drastic emergency action by the government.

13.     Treasury, however, was not content to share the value of the Companies with private shareholders. Indeed, unbeknownst to the public, Treasury had long resolved "to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." By the middle of 2012, however, it was apparent that the purchases of Government Stock caused by the Companies' paper losses would not achieve this goal.

14.     Therefore, on August 17, 2012, just days after the Companies announced their second quarter earnings, Treasury and FHFA entered the Net Worth Sweep to expropriate for the federal government the value of Fannie and Freddie shares held by private investors. Treasury itself said that the Net Worth Sweep was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers." With the stroke of a pen, the government had nationalized the Companies and taken all the value of the Companies for itself, thereby depriving the private shareholders of all their economic rights. The Companies received no investment by Treasury or other meaningful consideration in return for the Net Worth Sweep.

15.     The Net Worth Sweep has resulted in a massive financial windfall for the federal government. From the fourth quarter of 2012, the first fiscal quarter subject to the Net Worth Sweep, through the first quarter of 2015, the most recently completed fiscal quarter, Fannie and Freddie generated nearly $170 billion in net income. But rather than using those profits to build capital reserves and prepare to exit conservatorship, Fannie and Freddie instead were forced to pay more than $175 billion in "dividends" to the federal government under the Net Worth Sweep (funded by that net income and draining prior retained earnings)—nearly $130 billion more than the government could have gotten under the original PSPAs. Adding Net Worth Sweep dividends to the dividends Fannie and Freddie had already paid, Treasury has now recouped over $40 billion more than it has invested in the Companies. Yet, the amount of outstanding

6

Government Stock remains $189 billion, and the federal government continues to insist that it has the right to all of Fannie's and Freddie's future earnings. At the time of the Net Worth Sweep, Treasury and FHFA knew or should have known that it would result in this massive financial windfall.

16. The Net Worth Sweep blatantly transgresses the limits Congress has placed on FHFA's and Treasury's authority. As conservator of Fannie and Freddie, FHFA is charged with rehabilitating the Companies with a view to returning them to private control. The Net Worth Sweep guarantees that this can *never* be accomplished. Indeed, FHFA has indicated that it will operate Fannie and Freddie for the benefit of the government until Congress takes action to resolve the situation. And Treasury exchanged its existing equity stake in the Companies for the new and different equity stake granted to it by the Net Worth Sweep years *after* its temporary authority to acquire the Companies' stock had expired. What is more, on information and belief Treasury compelled FHFA to agree to the Net Worth Sweep despite Congress's express direction that FHFA exercise its conservatorship authority independently.

17. By entering the Net Worth Sweep, FHFA violated HERA in at least five ways. First, FHFA failed to act as a "conservator" because conservators are not allowed to use the companies under their care as ATM machines. Second, FHFA is required to put Fannie and Freddie in a sound and solvent condition, but the Net Worth Sweep forces the Companies to operate on the edge of insolvency. Third, FHFA is required to conserve and preserve Fannie's and Freddie's assets, but the Net Worth Sweep requires the dissipation of assets by forcing the Companies to pay their net worth to the government on a quarterly basis. Fourth, FHFA is charged with rehabilitating Fannie and Freddie and seeking to return them to private control, but the Net Worth Sweep makes any such outcome impossible. Finally, FHFA as conservator cannot

7

be subject to the direction and supervision of any other government agency, but, on information and belief, FHFA entered the Net Worth Sweep at the direction and supervision of Treasury.

18.     Treasury's violation of HERA is straightforward: the Net Worth Sweep, by changing the fundamental economic characteristics of Treasury's investment, created a new security, and HERA forbade Treasury from acquiring Fannie and Freddie stock in 2012.

19.     This Court must set aside the Net Worth Sweep and restore to Plaintiffs the property rights the federal government has unlawfully expropriated for itself.

## II.
## JURISDICTION AND VENUE

20.     Counts I-III of this action arise under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-706, and/or the Housing and Economic Recovery Act of 2008 ("HERA"), PUB. L. NO. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. §§ 1455, 1719, 4617). The Court has subject-matter jurisdiction over these claims under 28 U.S.C. § 1331. The Court is authorized to issue the non-monetary relief sought with respect to these claims pursuant to 5 U.S.C. §§ 702, 705, and 706.  The Court has subject matter jurisdiction over Counts IV-V under 28 U.S.C. §1367.

21.     The Court also has subject matter jurisdiction over Counts IV-V under 12 U.S.C. §§ 1452(c), 1723(a), and 4617(b)(2)(A).

22.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is an action against officers and agencies of the United States, Plaintiffs Thomas and Ida Saxton reside in this judicial district, and no real property is involved in the action.

8

# III.
## PARTIES

23.     Plaintiffs Thomas and Ida Saxton are citizens of the United States and residents and citizens of the State of Iowa. The Saxtons reside in Cedar Rapids, Iowa, in Linn County.

24.     Plaintiff Bradley Paynter is a citizen of the United States and a resident and citizen of the State of Washington.

25.     Defendant FHFA is, and was at all relevant times, an independent agency of the United States Government subject to the APA. *See* 5 U.S.C. § 551(1). FHFA was created on July 30, 2008, pursuant to HERA. FHFA is located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.

26.     Defendant Melvin L. Watt is the Director of FHFA. His official address is Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024. He is being sued in his official capacity. In that capacity, Director Watt has overall responsibility for the operation and management of FHFA. Director Watt, in his official capacity, is therefore responsible for the conduct of FHFA that is the subject of this Complaint and for the related acts and omissions alleged herein.

27.     Defendant Department of the Treasury is, and was at all times relevant hereto, an executive agency of the United States Government subject to the APA. *See* 5 U.S.C. § 551(1). Treasury is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

# IV.
## FACTUAL ALLEGATIONS

### Fannie and Freddie

28.     Fannie is a for-profit, stockholder-owned corporation organized and existing under the Federal National Mortgage Act. Freddie is a for-profit, stockholder-owned corporation

9

organized and existing under the Federal Home Loan Corporation Act. The Companies' business includes purchasing and guaranteeing mortgages originated by private banks and bundling the mortgages into mortgage-related securities that can be sold to investors.

29. Fannie and Freddie are owned by private shareholders and their securities are publicly traded. Fannie was chartered by Congress in 1938 and originally operated as an agency of the Federal Government. In 1968, Congress reorganized Fannie into a for-profit corporation owned by private shareholders. Freddie was established by Congress in 1970 as a wholly-owned subsidiary of the Federal Home Loan Bank System. In 1989, Congress reorganized Freddie into a for-profit corporation owned by private shareholders.

30. Before being placed into conservatorship, both Fannie and Freddie had issued common stock and several series of preferred stock. The several series of preferred stock of the Companies are in parity with each other with respect to dividend payments and liquidation preference, but they have priority over the Companies' common stock for these purposes. In essence, before common shareholders can be paid a dividend, dividends must be paid to the holders of preferred stock. And in a liquidation, the holders of preferred stock must receive the full par value of their stock before the common shareholders receive any value. The common stock is entitled to the residual economic value of the firms.

31. Plaintiff Thomas Saxton owns shares in the Z series of Freddie preferred stock. Plaintiffs Thomas and Ida Saxton also own shares of Freddie common stock, both individually and jointly. The Saxtons first acquired shares of Freddie common stock in 2008, before imposition of the conservatorship, and they have owned common shares continuously since that time.

32.     Plaintiff Bradley Paynter owns shares of Fannie common stock. His parents, who reside in Cedar Rapids, Iowa, purchased the shares for him as a gift in 1996. Mr. Paynter has owned the stock since that time. He lived in Iowa until 2014, when he moved to the State of Washington.

33.     Prior to 2007, Fannie and Freddie were consistently profitable. In fact, Fannie had not reported a full-year loss since 1985 and Freddie had never reported a full-year loss since becoming owned by private shareholders. In addition, both Companies regularly declared and paid dividends on their preferred and common stock.

34.     Beginning in late 2006, and accelerating in 2008, the nation's housing market and mortgage banking industry suffered significant book losses and a substantial decline in value. As the housing and financial crisis deepened, Congress responded in part by enacting HERA. As relevant here, HERA created FHFA (which succeeded to the regulatory authority over Fannie and Freddie previously held by the Office of Federal Housing Enterprise Oversight) and authorized FHFA, under certain statutorily prescribed and circumscribed conditions, to place those Companies into either conservatorship or receivership.

### Fannie and Freddie Are Placed into Conservatorship

35.     On September 6, 2008, FHFA—under significant pressure from Treasury—placed Fannie and Freddie into conservatorship pursuant to the authority and requirements of HERA. As then-FHFA Director Lockhart explained, conservatorship "is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations." Statement of James B. Lockhart, Director, FHFA, at 5-6 (Sept. 7, 2008).

36.     According to HERA, FHFA "may, as conservator, take such action as may be— (i) necessary to put the regulated entity in a sound and solvent condition, and (ii) appropriate to

11

carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). Thus, as FHFA has acknowledged, "[t]he purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition" and that "[t]o fulfill the statutory mandate of conservator, FHFA must follow governance and risk management practices associated with private-sector disciplines." FHFA, REPORT TO CONGRESS 2009 at i, 99 (May 25, 2010).

37.    Conservatorship is a status distinct from receivership, with very different purposes, responsibilities, and restrictions. When acting as a receiver, but not when acting as a conservator, FHFA is authorized and obliged to "place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity." *Id.* § 4617(b)(2)(E). The only "post-conservatorship outcome[] . . . that FHFA may implement today under existing law," by contrast, "is to reconstitute [Fannie and Freddie] under their current charters." Letter from Edward J. DeMarco, Acting Director, FHFA, to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and to the House Committee on Financial Services 7 (Feb. 2, 2010). In other words, receivership is aimed at winding down an entity's affairs and liquidating its assets, while conservatorship aims to rehabilitate it and return it to normal operation. This distinction between the purposes and authorities of a receiver and a conservator is a well-established tenet of financial regulation.

38.    In promulgating regulations governing its operations as conservator or receiver of the Companies, FHFA specifically acknowledged the distinctions in its statutory responsibilities as conservator and as receiver: "A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition." Conservatorship and Receivership, 76 Fed. Reg. 35,724, 35,730 (June 20, 2011). In contrast, when FHFA acts as a

receiver, the regulation specifically provides that "[t]he Agency, as receiver, *shall* place the regulated entity in liquidation . . . ." 12 C.F.R. § 1237.3(b) (emphasis added).

39.     In announcing the conservatorship, Director Lockhart stated that "FHFA will act as the conservator to operate [Fannie and Freddie] until they are stabilized." Statement of Lockhart at 6. Director Lockhart and the FHFA also announced that under the conservatorship "the common and all preferred stocks [of the Companies] will continue to remain outstanding," *id.* at 8, and "continue to trade," *FHFA Fact Sheet, Questions and Answers on Conservatorship* 3, and that Fannie's and Freddie's stockholders "will continue to retain all rights in the stock's financial worth." *Id.* Director Lockhart further testified before Congress that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest. Sept. 25, 2008, Hearing, U.S. House of Representatives, Committee on Financial Servs, H.R. Hrg. 110-142 at 29-30, 34.

40.     FHFA also emphasized that the conservatorship was temporary: "Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship." *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2. Investors were entitled to rely on these official statements of the purposes of the conservatorship, and public trading in Fannie's and Freddie's stock was permitted to, and did, continue.

### FHFA and Treasury Enter into the Purchase Agreements

41.     On September 7, 2008, Treasury and FHFA, acting in its capacity as conservator of Fannie and Freddie, entered into the Preferred Stock Purchase Agreements.

42.     In entering into the Purchase Agreements, Treasury exercised its temporary

authority under HERA to purchase securities issued by the Companies. *See* 12 U.S.C. §§ 1455(*l*),

1719(g). To exercise that authority, the Secretary of the Treasury ("Secretary") was required to

determine that purchasing the Companies' securities was "necessary . . . to provide stability to

the financial markets; . . . prevent disruptions in the availability of mortgage finance; and . . .

protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). In making those

determinations, the Secretary was required to consider six factors:

> (i) The need for preferences or priorities regarding payments to the Government.
> (ii) Limits on maturity or disposition of obligations or securities to be purchased.
> (iii) *The [Companies'] plan[s] for the orderly resumption of private market funding or capital market access*.
> (iv) The probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment.
> (v) *The need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]*.
> (vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C) (emphasis added).

43.     HERA's legislative history underscores the temporary nature of Treasury's

authority to purchase Fannie and Freddie securities. Secretary Paulson testified to Congress that

HERA would give "Treasury an 18-month *temporary* authority to purchase—only if necessary—

equity in either of these two [Companies]." *Recent Developments in U.S. Financial Markets and

Regulatory Responses to Them: Hearing before the Comm. on Banking, Housing and Urban

Dev.*, 100th Cong. (2008) (statement of Henry M. Paulson, Secretary, Dep't of the Treasury) at 5

(emphasis added). In response to questioning from Senator Shelby, Secretary Paulson reiterated

14

that Treasury's authority to purchase Fannie and Freddie stock was intended to be a "short-term" solution that would expire at "the end of 2009." *Id.* at 11-12.

44.     Treasury's authority under HERA to purchase the Companies' securities expired on December 31, 2009. *See id.* §§ 1455(*l*)(4), 1719(g)(4).

45.     Treasury's PSPAs with Fannie and Freddie are materially identical. Under the original unamended agreements, Treasury committed to provide up to $100 billion to each Company to ensure that it maintained a positive net worth. In particular, for quarters in which either Company's liabilities exceed its assets under GAAP, the PSPAs authorize Fannie and Freddie to draw upon Treasury's commitment in an amount equal to the difference between its liabilities and assets.

46.     In return for its funding commitment, Treasury received 1 million shares of Government Stock in each Company and warrants to purchase 79.9% of the common stock of each Company at a nominal price. Exercising these warrants would entitle Treasury to up to 79.9% of all future profits of the Companies, subject to the Companies' obligation to satisfy their dividend obligations with respect to the preferred stock and to share the remaining 20.1% of those profits with private common shareholders. As Treasury noted in entering the PSPAs, the warrants "will provide potential future upside to the taxpayers." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

47.     Treasury's Government Stock in each Company had an initial liquidation preference of $1 billion. This liquidation preference increases by one dollar for each dollar the Companies receive from Treasury pursuant to the PSPAs. In the event the Companies liquidate, Treasury is entitled to recover the full liquidation value of its shares before any other shareholder may recover anything.

15

48.     In addition to the liquidation preference, the original unamended PSPAs provided for Treasury to receive either a cumulative cash dividend equal to 10% of the value of the outstanding liquidation preference or a stock dividend. If the Companies decided not to pay the dividend in cash, the value of the dividend would be added to the liquidation preference— effectively amounting to an in-kind dividend payment of additional Government Stock. After an in-kind dividend payment, the dividend rate would increase to 12% until such time as full cumulative dividends were paid in cash, at which time the rate would return to 10%. The plain terms of the PSPAs thus make clear that Fannie and Freddie never were required to pay a cash dividend to Treasury but rather had the discretion to pay dividends in kind. *See, e.g.*, U.S. TREASURY DEP'T OFFICE OF PUB. AFFAIRS, FACT SHEET: TREASURY SENIOR PREFERRED STOCK PURCHASE AGREEMENT, Sept. 7, 2008 ("The senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash . . . ."); Treasury Presentation to SEC, GSE Preferred Stock Purchase Agreements (PSPA), Overview and Key Considerations at 9, June 13, 2012 ("Dividend Rate Cash 10%; if elected to be paid in kind ('PIK') 12%.").  Moreover, there was never any risk that payment of dividends would render the Companies insolvent since it would have been illegal for either Company to pay a dividend that would render it insolvent.

49.     An in-kind dividend payment would not decrease Treasury's funding commitment because only when the Companies receive "funding under the Commitment" does its size decrease. Fannie and Freddie Amended and Restated Senior Preferred Stock Purchase Agreements ("PSPA") § 1. Thus, as the Congressional Research Service has acknowledged, under the PSPAs' original terms the Companies could "pay a 12% annual senior preferred stock dividend indefinitely." N. ERIC WEISS, CONG. RESEARCH SERV., RL34661, FANNIE MAE'S AND

16

FREDDIE MAC'S FINANCIAL PROBLEMS (Aug. 10, 2012). In other words, because of the payment-in-kind option, there was no risk—none whatsoever—that the PSPAs would force Fannie and Freddie to exhaust Treasury's funding commitment to facilitate the payment of dividends.

50. Finally, the PSPAs provided for the Companies to pay Treasury a quarterly periodic commitment fee "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." PSPA § 3.2(a). The periodic commitment fee was to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive it for up to a year at a time. Treasury has exercised this option and has never received a periodic commitment fee under the PSPAs.

51. The PSPAs and the Government Stock Certificates explicitly contemplate that the Companies could pay down the liquidation preference and that when it is paid down "in full, such [Government Stock] shares shall be deemed to have been redeemed." Certificate §§ 3(c), 4(c). Indeed, the PSPAs were "structure[d]" to "enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

52. The PSPAs prohibit Fannie and Freddie from declaring and paying dividends on any securities junior to Treasury's Government Stock unless full cumulative dividends have been paid to Treasury on its Government Stock for the then-current and all past dividend periods.

53. In approving the exercise of Treasury's temporary authority under HERA to purchase securities of the Companies, Treasury Secretary Paulson determined (1) "[u]nder conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns"; (2) "Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent

17

operations"; and (3) "[c]onservatorship preserves the status and claims of the preferred and common shareholders." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

### Treasury and FHFA Amend the Purchase Agreements
### To Increase Treasury's Funding Commitment

54.     On May 6, 2009, Treasury and FHFA amended the terms of the Purchase Agreements to increase Treasury's funding commitment to both Fannie and Freddie. In particular, under the amendment Treasury's total commitment to each Company increased from $100 billion to $200 billion.

55.     On December 24, 2009—one week before Treasury's temporary authority under HERA expired—FHFA and Treasury again amended the terms of Treasury's funding commitment. Instead of setting that commitment at a specific dollar amount, the second amendment established a formula to allow Treasury's total commitment to each Company to exceed (but not fall below) $200 billion depending upon any deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012.

56.     Treasury's authority under HERA then expired on December 31, 2009. As Treasury acknowledged, expiration of this authority meant that its "ability to make further changes to the PSPAs . . . [was] constrained." Action Memorandum for Secretary Geithner at 3 (Dec. 22, 2009).

### The Companies Return to Profitability and Stability

57.     Beginning in the third quarter of 2008, the balance sheets of Fannie and Freddie reflected large non-cash losses, including write-downs of the value of goodwill, intangibles, and significant tax assets and the establishment of large loan loss reserves, based on exceedingly pessimistic views of the Companies' future financial prospects. These non-cash losses temporarily decreased the Companies' operating capital and their net worth by hundreds of

18

billions of dollars. For example, in the first year and a half after imposition of the conservatorship Fannie reported $127 billion in losses, but only $16 billion of that amount reflected actual credit-related losses. Upon information and belief, FHFA directed Fannie and Freddie to record these excessive non-cash losses at the insistence of Treasury, and they resulted in excessive purchases of Government Stock by Treasury.

58.     To date, the Companies have drawn a total of $187 billion from Treasury, in large part to fill the holes in the Companies' balance sheets created by these non-cash losses. Including Treasury's initial $1 billion liquidation preference in each Company, Treasury's liquidation preference for its Government Stock amounts to approximately $117 billion for Fannie and approximately $72 billion for Freddie. Approximately $26 billion of these combined amounts were drawn simply to pay the 10% dividend payments owed to Treasury. (In other words, FHFA requested draws to pay Treasury this $26 billion in cash rather than electing to pay the dividends in kind. Had the dividends been paid in kind, FHFA would not have had to draw from (and, consequently, reduce the remaining size of) Treasury's commitment to pay them.)  Thus, Treasury actually "invested" approximately $161 billion in the Companies, primarily reflecting changes in the valuation estimates of assets and liabilities.

59.     By 2012, the housing market was already recovering and both Fannie and Freddie had returned to profitability. In August 2012, the Companies and FHFA knew or should have known that previously anticipated losses far exceeded their actual losses. These excess loss reserves artificially depressed the Companies' net worth. Upon reversal of these loss reserves, Fannie's and Freddie's net worth increases accordingly. Fannie has not drawn on Treasury's commitment since the fourth quarter of 2011, and Freddie has not drawn on Treasury's

19

commitment since the first quarter of 2012. In fact, in the first two quarters of 2012, the Companies posted sizable profits totaling more than $11 billion.

60. As Fannie explained in August 2012:

> [w]e experienced a significant improvement in our financial results for the second quarter and first half of 2012 compared with the second quarter and first half of 2011. . . . [W]e saw improvement in the housing market in the first half of 2012. In addition, we have seen further improvement in the performance of our book of business, including lower delinquency rates and higher re-performance rates for our modified loans.

Fannie Mae, Second Quarter Report (Form 10-Q) at 2 (Aug. 8, 2012). FHFA's Office of Inspector General similarly recognized that by early August 2012 "Fannie and Freddie were experiencing a turnaround in their profitability. Due to rising house prices and reductions in credit losses, in early August 2012 the Companies reported significant income for the second quarter 2012 . . . and neither required a draw from Treasury under the [Purchase Agreements]." FHFA, Office of Inspector General, Analysis of the 2012 Amendments to the Government Stock Purchase Agreements at 11 (Mar. 20, 2013) ("FHFA Inspector General Report").

61. Together, the Companies' return to profitability and the stable recovery of the housing market showed in early 2012 that the Companies could in time redeem Treasury's Government Stock and provide a return on investment to owners of their preferred and common stock.

62. Fannie and Freddie are now immensely profitable. Fannie's reported net income was $17.2 billion in 2012. And it far exceeded that figure in 2013, with a reported net income of $84.0 billion. And in 2014, Fannie reported net income of $14.2 billion.

63. Fannie's 2013 net income includes the release of $58.3 billion of the company's deferred tax assets valuation allowance. The release of this valuation allowance underscores Fannie's financial strength, as it demonstrates Fannie's expectation that it will generate sizable

20

taxable income moving forward. A deferred tax asset is an asset that may be used to offset future tax liability. If a company determines that it is unlikely that some or all of a deferred tax asset will be used, the company must establish a "valuation allowance" in the amount that is unlikely to be used. In other words, a company cannot record a deferred tax asset as an asset if it is unlikely to be used to offset future taxable profits. Fannie relied on the following evidence of future profitability in support of the release of its valuation allowance:

- our profitability in 2012 and the first quarter of 2013 and our expectations regarding the sustainability of these profits;
- our three-year cumulative income position as of March 31, 2013;
- the strong credit profile of the loans we have acquired since 2009;
- the significant size of our guaranty book of business and our contractual rights for future revenue from this book of business;
- our taxable income for 2012 and our expectations regarding the likelihood of future taxable income; and
- that our net operating loss carryforwards will not expire until 2030 through 2031 and we expect to utilize all of these carryforwards within the next few years.

Fannie Mae, First Quarter Report (Form 10-Q) at 15 (May 9, 2013).

64. Like Fannie, Freddie has also returned to stable profitability. Freddie reported net income of $11 billion in 2012. In 2013, it reported net income of $48.7 billion—reflecting, among other things, Freddie's decision to release a sizeable ($26.4 billion) deferred tax assets valuation allowance. And in 2014, Freddie reported net income of $7.7 billion.

65. Freddie relied on the following evidence in support of its release of its valuation allowance:

- Our three-year cumulative income position as of September 30, 2013;
- The strong positive trend in our financial performance over the last six quarters, including the quarter ended September 30, 2013;

- The 2012 taxable income reported in our federal tax return which was filed in the quarter ended September 30, 2013;
- Our forecasted 2013 and future period taxable income;
- Our net operating loss carryforwards do not begin to expire until 2030; and
- The continuing positive trend in the housing market.

Freddie Mac, Third Quarter Report (Form 10-Q) at 51 (Nov. 7, 2013).

66.     In addition to the release of deferred tax assets valuation allowances, Fannie's and Freddie's earnings reflect billions of dollars of additional gains attributable to sources of profit other than their day-to-day business operations, such as the reversal of loss reserves and the settlement of legal actions. For example, in 2013 and 2014 the Companies recovered over $18 billion from settlements of claims and suits brought by FHFA as conservator relating to the sale of private-label securities to Fannie and Freddie between 2005 and 2007.

67.     The Companies, FHFA, and Treasury knew or should have known in August 2012 that the Companies would reverse substantial loss and deferred tax reserves and reap substantial profits from lawsuits and sources other than their day-to-day business operations.

68.     For example, by the time of the Net Worth Sweep in August 2012, the government knew that the valuation allowance associated with the Companies' deferred tax assets could be reversed, thereby creating a windfall of tens of billions of dollars of profits to be swept by the government. At that time, Fannie and Freddie had a combined deferred tax assets valuation allowance of nearly $100 billion. That valuation allowance would have to be reversed if the Companies determined that it was more likely than not that they would be able to use their deferred tax assets. The Treasury Department was intimately familiar with these issues having seen such a reversal in February 2012 in connection with its massive investment in AIG. What is more, the very projections Treasury gave to other government agencies in connection with the Net Worth Sweep in June 2012 showed Fannie and Freddie earning billions of dollars a year

22

(and therefore generating substantial tax liability) for many years into the future. Furthermore, Freddie's SEC filings indicated that the Company had already begun using its deferred tax assets by the middle of 2012, a fact that FHFA surely knew since its officials closely supervised the Companies' management and financial reporting. A senior executive at one of the Companies even discussed the reversal of the deferred tax assets valuation allowance with Treasury on the eve of the Net Worth Sweep. This item alone would generate a profit of tens of billions of dollars. In short, the government had actual knowledge that the Net Worth Sweep would result in a windfall far in excess of payments that would have been realized under the prior contractual agreement.

69.     In sum, "[m]uch has changed since 2008. The housing market is improving, house prices are rising, and guarantee fees have been increased, all resulting in greater profitability at Fannie Mae and Freddie Mac." FHFA Inspector General Report at 16; *see also* FHFA, REP. TO CONGRESS iii (2012) ("the overall improvement in the housing market, improved quality of new loans guaranteed, and increased guarantee fee pricing, along with income from the retained portfolio have resulted in improved financial results"). And as FHFA and its then-Acting Director have recognized, "[t]he conservatorships of Fannie Mae and Freddie Mac, . . . combined with U.S. Treasury financial support and management actions, have stabilized" the Companies, FHFA, 2012 REP. at ii, and "it is clear they are each beginning to show regular, strong profitability," Edward J. DeMarco, Acting Director, FHFA, Remarks as Prepared for Delivery at Fed. Reserve Bank of Chicago's 49th Annual Conference on Bank Structure and Competition 2 (May 9, 2013).

**FHFA and Treasury Amend the PSPAs**
**To Expropriate the Companies' Net Worth**

23

70.     On August 17, 2012, within days after the Companies had announced their return to profitability and just as it was becoming clear that they had regained the earnings power to redeem Treasury's Government Stock and exit conservatorship, FHFA and Treasury amended the PSPAs for a third time. Again, at the time that this third amendment was "under consideration, Fannie Mae and Freddie Mac were experiencing a turnaround in their profitability. Due to rising house prices and reductions in credit losses, in early August 2012 the [Companies] reported significant income for the second quarter 2012 . . . and neither required a draw from Treasury under the PSPAs." FHFA Inspector General Report at 11. But rather than fulfilling its statutory responsibility as conservator to return the Companies to sound and solvent business operations and, ultimately, to private control, FHFA entered into the Net Worth Sweep with Treasury, which expropriates all of the Companies' profits and makes their rehabilitation impossible.

71.     As Treasury stated when the Net Worth Sweep was announced, the dividend sweep of all of the Companies' net worth requires that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012). The Net Worth Sweep, in short, effectively nationalized the Companies and confiscated the existing and potential value of all privately held equity interests, including the stock held by Plaintiffs.

72.     As a Staff Report from the Federal Reserve Bank of New York recently acknowledged, the Net Worth Sweep "effectively narrows the difference between conservatorship and nationalization, by transferring essentially all profits and losses from the firms to the Treasury." W. Scott Frame et al., *The Rescue of Fannie Mae and Freddie Mac* at 21,

FEDERAL RESERVE BANK OF NEW YORK STAFF REPORTS, no. 719 (Mar. 2015). The Economist stated the obvious in reporting that the Net Worth Sweep "squashe[d] hopes that [Fannie and Freddie] may ever be private again" and, as a result, "the companies' status as public utilities . . . appear[ed] crystal clear." Fannie Mae and Freddie Mac, *Back to Black*, THE ECONOMIST, Aug. 25, 2012, *available at* http:goo.gl/1PHMs.

73. As a result of the Net Worth Sweep, it is clear that FHFA will not allow Fannie and Freddie to exit conservatorship but rather will continue to operate them essentially as tools of the government until such time as Congress takes action to resolve the situation. Indeed, as of this writing FHFA's website states that "FHFA will continue to carry out its responsibilities as Conservator" until "Congress determines the future of Fannie Mae and Freddie Mac and the housing finance market." FHFA as Conservator of Fannie Mae and Freddie Mac, http://goo.gl/PjyPZb.

74. The Net Worth Sweep fundamentally changed the nature of Treasury's investment in the Companies. Instead of quarterly dividend payments at an annual rate of 10% (if paid in cash) or 12% (if paid in kind) of the total amount of Treasury's liquidation preference, the Net Worth Sweep entitles Treasury to quarterly payments of *all—100%—*of the Companies' existing net worth and future profits. Beginning January 1, 2013, the Companies have been required to pay Treasury a quarterly dividend equal to their *entire net worth*, minus a capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018.

75. The Companies did not receive any meaningful consideration for agreeing to the Net Worth Sweep. Because the Companies always had the option to pay dividends "in kind" at a 12% interest rate, the Net Worth Sweep did not provide the Companies with any additional flexibility or benefit. Rather than accruing a dividend at 12% (which never had to be paid in

25

cash), FHFA unlawfully agreed to make a payment of substantially all the Companies' net worth each quarter.

76.     The Net Worth Sweep also provides that the Companies will not have to pay a periodic commitment fee under the PSPAs while the Net Worth Sweep is in effect. But Treasury had consistently waived the periodic commitment fee before the Net Worth Sweep, and it could only set the amount of such a fee with the agreement of the Companies and at a market rate. Further, the purpose of the fee was to compensate Treasury for its ongoing support in the form of the commitment to invest in the Companies' Government Stock. By the time of the Net Worth Sweep, the 10 percent return on the Government Stock and the warrants for 79.9 percent of the common stock provided a more than adequate return on the government's stand-by commitment, and thus any additional fee would have been inappropriate. In August of 2012, the Companies had returned to stable profitability and were no longer drawing from Treasury's commitment. And, of course, by the time of the Net Worth Sweep Treasury's temporary authority to purchase the Companies' securities had already expired, making any further purchases contrary to law. Finally, even if a market-rate fee had been agreed between Treasury and FHFA and imposed pursuant to the PSPA, the Companies had sufficient market power to pass the entire amount of this fee through to their customers—as the Companies do for other operating and financing costs—without affecting profitability or the value of the Companies' equity securities.

77.     The Net Worth Sweep has proven to be immensely profitable for the federal government. The table below lists only the dividends Fannie and Freddie have paid under the Net Worth Sweep, and does not include dividends paid before that time:

**Dividend Payments Under the Net Worth Sweep**
**(in billions)**

26

|         |    | Fannie   | Freddie  | Combined |
|---------|----|----------|----------|----------|
| **2013** | Q1 | **$4.2**  | **$5.8**  | **$10.0** |
|         | Q2 | **$59.4** | **$7.0**  | **$66.4** |
|         | Q3 | **$10.2** | **$4.4**  | **$14.6** |
|         | Q4 | **$8.6**  | **$30.4** | **$39.0** |
| **2014** | Q1 | **$7.2**  | **$10.4** | **$17.6** |
|         | Q2 | **$5.7**  | **$4.5**  | **$10.2** |
|         | Q3 | **$3.7**  | **$1.9**  | **$5.6**  |
|         | Q4 | **$4.0**  | **$2.8**  | **$6.8**  |
| **2015** | Q1 | **$1.9**  | **$0.9**  | **$2.8**  |
|         | Q2 | **$1.8**  | **$0.7**  | **$2.5**  |
| **Total** |   | **$106.7** | **$68.8** | **$175.5** |

78.     As the above chart shows, the Companies will have paid Treasury over $175 billion in "dividends" under the Net Worth Sweep once the second quarter 2015 dividend payment is made. Had they instead been paying 10% cash dividends, they would have paid Treasury approximately $47 billion. The Net Worth Sweep has thus profited the federal government by nearly $130 billion. FHFA and Treasury knew or should have known that the Net Worth Sweep would result in a massive financial windfall for the federal government.

79.     The Net Worth Sweep is squarely contrary to FHFA's statutory responsibilities as conservator of Fannie and Freddie. Again, as conservator FHFA is obligated to "take such action as may be—(i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). As FHFA itself has acknowledged, the agency "has a statutory charge to work to restore a regulated entity in conservatorship to a sound and solvent condition . . . ." 76 Fed. Reg. at 35,727. Accordingly, "allowing capital distributions to deplete the entity's conservatorship assets would be

27

inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." *Id.* Thus, the FHFA's own regulations generally prohibit Fannie and Freddie from making a "capital distribution while in conservatorship," subject to certain exceptions. 12 C.F.R. § 1237.12(a). Indeed, as FHFA's Office of Inspector General has acknowledged, rather than putting Fannie and Freddie in sound and solvent condition the Net Worth Sweep's "reduction and eventual elimination of the [Companies'] capital reserves *increases* the likelihood of additional Treasury investment" in the Companies. FHFA-OIG, THE CONTINUED PROFITABILITY OF FANNIE MAE AND FREDDIE MAC IS NOT ASSURED, WHITE PAPER REPORT 21 (Mar. 18, 2015) (emphasis added).

80. As explained above, but for the Net Worth Sweep Fannie and Freddie would have nearly $130 billion of additional capital to cushion them from any future downturn in the housing market and to reassure debtholders of the soundness of their investments. Instead, because of the Net Worth Sweep, the Companies are required to operate at the edge of insolvency, making them fundamentally unsound and more likely to require an additional government bailout in the future.

81. The Net Worth Sweep's quarterly sweep of all net profits thus plainly harms, rather than promotes, the soundness and solvency of the Companies by effectively prohibiting them from rebuilding their capital. Nor can distributing the entire net worth of the Companies to Treasury be reconciled with FHFA's statutory obligation to preserve and conserve their assets and property. Indeed, Fannie has identified the dividend obligations imposed by the Net Worth Sweep as posing a "specific risk to [its] business" by prohibiting it from "build[ing] capital reserves." FANNIE MAE, UNIVERSAL DEBT FACILITY, OFFERING CIRCULAR (May 14, 2013).

28

82. Furthermore, on information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury. The Net Worth Sweep was a Treasury initiative, it was Treasury that informed the Companies just days before the Net Worth Sweep that it was forthcoming, and a meeting addressing the Net Worth Sweep was held at Treasury on August 16, 2012 during which Secretary Geithner announced the changes. Secretary Geithner apparently believed that even before the Net Worth Sweep "we had already effectively nationalized the GSEs . . ., and could decide how to carve up, dismember, sell or restructure those institutions." Plaintiff's Corrected Post-Trial Proposed Findings of Fact 26.2.1(a), *Starr Int'l Co. v. United States*, No. 1:11-cv-779-TCW (Fed. Cl. March 2, 2015), ECF No. 430. The Net Worth Sweep is just one example of the significant influence Treasury has exerted over FHFA from the beginning of the conservatorship. Indeed, Secretary Paulson has written that "seizing control" of Fannie and Freddie, an action that is statutorily reserved to FHFA, was an action "I took." HENRY M. PAULSON, JR., ON THE BRINK xiv (2d ed. 2013). Treasury, however, lacks the authority to impose such direction and supervision, and FHFA lacks the authority to submit to it. HERA expressly provides that "[w]hen acting as conservator, . . . [FHFA] shall not be subject to the direction or supervision of any other agency of the United States . . . ." 12 U.S.C. § 4617(a)(7).

83. Contrary to statutory authority, both Treasury and FHFA understood the Net Worth Sweep to be a step toward the liquidation, not the rehabilitation, of the Companies. This was in stark contrast to FHFA's then-Acting Director's statement two years earlier that, absent legislative action, "the only [post-conservatorship option] that FHFA may implement today under existing law is to reconstitute [Fannie and Freddie] under their current charters." February 2, 2010 Letter of Acting Director DeMarco to Chairmen and Ranking Members of the Senate

Committee on Banking, Housing, and Urban Affairs and the House Committee on Financial Services.

84. Statements by both FHFA and Treasury provide further confirmation that the Net Worth Sweep violates FHFA's statutory restrictions as conservator. Treasury, for example, said the Net Worth Sweep would "expedite the wind down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the Treasury, *Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012). Indeed, Treasury emphasized that the Net Worth Sweep would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id.*

85. Unbeknownst to the public, as early as December 2010, an internal Treasury memorandum acknowledged the "Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." Action Memorandum for Secretary Geithner (Dec. 20, 2010). Just weeks later, however, in another internal document the author of this memorandum acknowledged that "the path laid out under HERA and the Paulson Treasury when the GSEs were put into conservatorship in September 2008" was for Fannie and Freddie to "becom[e] adequately capitalized" and "exit conservatorship as private companies" with "exiting common shareholders" being "substantially diluted"—but not eliminated. Information Memorandum for Secretary Geithner (Jan. 4, 2011). The memorandum also acknowledged that any threat to Treasury's funding commitment from dividend payments potentially could be addressed by "converting [Treasury's] preferred stock

30

into common or cutting or deferring payment of the dividend (under legal review)." *Id.* In other words, the problem Treasury was purportedly trying to solve with the Net Worth Sweep, a cash dividend too high to be serviced by earnings, could be addressed by other means already known to the government, such as cutting or deferring payment of the dividend. Indeed, as explained above, because of the payment-in-kind option available to FHFA and the Companies, the purported problem was entirely illusory. Nevertheless, in 2012 FHFA and Treasury implemented the Administration's commitment to eliminate the value of privately-owned shares by entering the Net Worth Sweep.

86.     FHFA Acting Director Edward DeMarco informed a Senate Committee that the "recent changes to the PSPAs, replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking & Urban Affairs 3 (Apr. 18, 2013). In its 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac." FHFA, 2012 REP. at 13. Thus, according to FHFA, the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." *Id.* at 1, 13. In short, the Net Worth Sweep plainly is central to the FHFA's new plan to "wind[] up the affairs of Fannie and Freddie," Remarks of Edward J. DeMarco, Getting Our House in Order at 6 (Wash., D.C., Oct. 24, 2013), and thus cannot be reconciled with the agency's statutory obligations as conservator of Fannie and Freddie.

87.     While waiting for Congress to take action on Fannie and Freddie, FHFA has resolved to operate the Companies for the benefit of the federal government rather than for the

31

benefit of the Companies themselves and their private stakeholders. The Net Worth Sweep is only the most blatant manifestation of this decision, which is reflected in numerous additional FHFA statements and actions. In short, FHFA has resolved to operate Fannie and Freddie with a view toward "minimiz[ing] losses on behalf of taxpayers," and not with a view toward rebuilding their capital and returning them to private control, as HERA demands. FHFA, A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIPS: THE NEXT CHAPTER IN A STORY THAT NEEDS AN ENDING 7 (Feb. 21, 2012). Indeed, it has made clear that its "overriding objectives" are to operate Fannie and Freddie to serve the federal government's policy goals of "[g]etting the most value for taxpayers and bringing stability and liquidity to housing finance . . . ." *Id*. at 21. Director Watt summed up the situation succinctly when stating that he does not "lay awake at night worrying about what's fair to the shareholders" but rather focuses on "what is responsible for the taxpayers." Nick Timiraos, *FHFA's Watt 'Comfortable' with U.S. Sweep of Fannie, Freddie Profits*, WALL STREET JOURNAL MONEY BEAT BLOG (May 16, 2014, 3:40 PM), http://goo.gl/Tltl0U.

88. The dramatically negative impact of the Net Worth Sweep on the Companies' balance sheets is demonstrated by Fannie's results in the first quarter of 2013. At the end of the first quarter Fannie's net worth stood at $62.4 billion. Under the prior versions of the PSPAs, if Fannie chose to declare a cash dividend it would have been obligated to pay Treasury a dividend of only $2.9 billion, and the balance—$59.5 billion—would have been credited to its capital. The Net Worth Sweep, however, required Fannie to pay Treasury $59.4 billion. Treasury and FHFA knew or should have known upon entry into the Net Worth Sweep that Treasury would obtain such a windfall. Indeed, FHFA's Office of Inspector General recognized that, as a result of the Net Worth Sweep, reversal of the Companies' deferred tax assets valuation allowances could

32

result in "an extraordinary payment to Treasury." FHFA Inspector General Report at 15. And internal Fannie records reveal that one expected effect of the Net Worth Sweep was that the Company would be able to pay back the federal government faster than under the prior arrangement. That, of course, could only be true if Fannie expected to out-earn the prior 10% dividend.

89.     Contrary to FHFA's statutory authority, FHFA has ensured that the Companies cannot operate independently and must be wards of the federal government. FHFA has announced that, during the conservatorship, existing statutory and FHFA-directed regulatory capital requirements will not be binding on the Companies. And at the end of 2012, Fannie had a deficit of core capital in relation to statutory minimum capital of $141.2 billion. This deficit decreased to $88.3 billion by the end of the first quarter of 2013. When adjusted for the $59.4 billion dividend payment to Treasury, however, Fannie's core capital deficit jumped back up to $147.7 billion. Thus, because of the Net Worth Sweep, Fannie was in a *worse* position with respect to its core capital than it was before the record-breaking profitability it achieved in the first quarter of 2013.

90.     Furthermore, under FHFA's conservatorship Fannie and Freddie have elected to pay Treasury its dividend in cash, even though their net worth includes changes in both cash and non-cash assets. In the first quarter of 2013, for example, over $50 billion of Fannie's profitability resulted from the release of the Company's deferred tax assets valuation allowance—the same non-cash asset that previously created massive paper losses for the Company. As a result, Fannie was required to "fund [its] second quarter dividend payment of $59.4 billion primarily through the issuance of debt securities." Fannie, 2013 First Quarter Report, at 42.

91.     Borrowing money to pay an enormous dividend on a paper profit is clearly contrary to FHFA's statutory obligations as conservator, as FHFA is operating the Companies in an unsafe and unsound manner and hindering the ability of the Companies to restore their financial health so that they can be returned to normal business operations.

92.     The Net Worth Sweep has become a major revenue source for the United States Government at the expense of Plaintiffs and other private shareholders. For example, the federal government's record-breaking $53.2 billion surplus for the month of December 2013 was driven in large part by the $39 billion swept from Fannie and Freddie.

93.     As previously noted, Treasury's temporary statutory authority to purchase the securities of the Companies was conditioned on its consideration of certain statutory factors, including "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and the Companies' plans "for the orderly resumption of private market funding or capital market access." *See* 12 U.S.C. §§ 1455(*l*)(1)(C), 1719(g)(1)(C). There is no public record that Treasury considered these factors before executing the Net Worth Sweep, and Treasury has asserted that it did not need to consider them. Indeed, the terms of the Net Worth Sweep requiring the quarterly payment of all profits and the winding down of the Companies' operations are wholly inconsistent with these factors. There is also no evidence that Treasury adequately considered alternatives to the Net Worth Sweep that would have been consistent with its statutory obligations, less harmful to Plaintiffs and other private shareholders, and more likely to ensure the Companies' future solvency. Finally, there is no evidence that Treasury fulfilled the statutory requirement to report exercises of its temporary purchase authority to Congress upon entering the Net Worth Sweep. *See* 12 U.S.C. §§ 1455(*l*)(1)(D); 1719(g)(1)(D).

34

94.     FHFA made no public record of its contemporaneous decision-making processes in agreeing to the Net Worth Sweep. There is no public record that FHFA adequately considered whether the Net Worth Sweep is consistent with its statutory obligations as conservator of the Companies. Treasury's stated purpose of winding down the Companies, which necessarily involves liquidating their assets and property, is incompatible on its face with FHFA's charge to put the Companies back into "a sound and solvent condition" and to "conserve [their] assets and property." There is also no evidence that FHFA adequately considered alternatives to the Net Worth Sweep that would have been both consistent with its statutory obligations and less harmful to private shareholders. Instead, there are statements by FHFA—including in its own Strategic Plan for the Companies—that the role of the conservator was to "minimize taxpayer losses" rather than protect and conserve the Companies.

95.     Finally, there is no public record that either government agency—Treasury or FHFA—considered whether the Net Worth Sweep is consistent with the contractual and fiduciary duties to private shareholders. And the Net Worth Sweep is wholly inconsistent with those duties.

### Dividend Payments Under the Purchase Agreements

96.     Fannie has drawn $116.1 billion from Treasury under the PSPAs. Once it pays its second quarter 2015 dividend, Fannie's purported dividends to Treasury under the PSPAs will total $138.2 billion. Freddie has drawn $71.3 billion from Treasury under the Purchase Agreements. Once it pays its second quarter 2015 dividend, Freddie's purported dividends to Treasury under the PSPAs will total $92.6 billion. Combined, Fannie and Freddie soon will have paid Treasury approximately $43 billion more than they have received.

97.     Yet, under the Net Worth Sweep, these purported dividend payments do not operate to pay down the liquidation preference or otherwise redeem any of Treasury's Government Stock. The liquidation preference of Treasury's Government Stock in the Companies purportedly remains at approximately $189 billion (due to the Companies' draws and the $1 billion initial valuation of Treasury's Government Stock in each) and will remain at that amount regardless of how many billions of dollars the Companies pay to Treasury in dividends going forward. The Government's rate of return is infinite, like that of a common equity holder.

98.     Indeed, the fundamental nature of the change in Treasury's investment resulting from the Net Worth Sweep is illustrated by the facts that Treasury is now effectively Fannie's and Freddie's *sole* equity shareholder and that Treasury's securities in the Companies are now equivalent to 100% of the Companies' common stock. After giving effect to the Net Worth Sweep, Treasury has both the right to receive all profits of the Companies as well as control over the manner in which the Companies conduct business. Accordingly, following the Net Worth Sweep Treasury's Government Stock should be characterized in a manner consistent with its economic fundamentals as 100% of the Companies' common stock. That FHFA and Treasury continue to label the Government Stock as a preferred equity security is not controlling, particularly in light of the fact that the Net Worth Sweep was not an arms-length business transaction. Rather it was a self-dealing arrangement between two agencies of the federal government for the benefit of the federal government and, upon information and belief, one of those agencies (FHFA) was acting at the direction of the other (Treasury). Moreover, as explained above, statements by Treasury and FHFA make clear that the Net Worth Sweep was designed with the intent to grant the federal government the right to all of Fannie's and Freddie's

future profits and to ensure that the Companies will remain under the control of the federal government and not return to the control of their private shareholders.

## CLAIMS FOR RELIEF

## COUNT I

### FHFA's Conduct Exceeds Its Statutory Authority As Conservator

99.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

100.     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D).  In addition to the limitations established under the APA, FHFA's authority as conservator of the Companies is strictly limited by statute. *See* 12 U.S.C. § 4617(b)(2)(D).

101.     The Net Worth Sweep is inimical to the very definition of what it means to be a conservator, which is a term with a well-established meaning in financial regulation. A conservator is charged with seeking to rehabilitate the company under its control, not to operate the company for its own benefit while stripping it of its assets.

102.     The Net Worth Sweep is in direct contravention of the statutory command that FHFA as conservator must undertake those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D). Indeed, rather than seeking to put the Companies in a "sound and solvent" condition and to preserve and conserve the Companies' assets and property, FHFA has expropriated the Companies' entire net worth for the benefit of the federal government, to the detriment of the Companies and private shareholders such as Plaintiffs.

37

103.    Furthermore, FHFA's purpose as conservator is to seek to rehabilitate Fannie and Freddie, but the Net Worth Sweep makes such rehabilitation impossible. Rather, the Net Worth Sweep makes clear that FHFA and Treasury intend to keep Fannie and Freddie in conservatorship indefinitely, operating them for the sole benefit of the federal government until such time as Congress passes legislation resolving the situation.

104.    On information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury. But because HERA mandates that FHFA perform its duties as conservator independent of the "direction or supervision of any other agency," 12 U.S.C. § 4617(a)(7), FHFA was not authorized to subject itself to Treasury's will.

105.    FHFA also acted beyond its authority by re-interpreting its statutory duty as a conservator under HERA to be a duty to taxpayers only and by resolving to hold Fannie and Freddie in a perpetual conservatorship to be operated for the benefit of the federal government.

106.    FHFA's conduct was therefore outside of FHFA's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiffs are therefore entitled to relief against FHFA pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT II

### Treasury's Conduct Exceeded Its Statutory Authority

107.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

108.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D).Treasury's statutory authority to purchase securities issued by the Companies expired on

38

December 31, 2009. 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4). The Net Worth Sweep, which was executed on August 17, 2012, contravenes this unambiguous limit on Treasury's authority.

109.    The Net Worth Sweep created an entirely new security. Under the original Purchase Agreements, Treasury purchased Government Stock that entitled it to a 10% cash or 12% in-kind quarterly dividend on an amount equal to the aggregate liquidation preference of the Government Stock. The Government Stock was a fixed return security not otherwise entitled to participate in the unlimited upside of the Companies' earnings. By contrast, the Net Worth Sweep entitles Treasury to a quarterly distribution of *all* of the Companies' earnings for as long as they remain in operation. The Net Worth Sweep thus effected a wholesale change to the nature of Treasury's securities after its statutory authority to purchase new securities had expired, and it converted Treasury's Government Stock into new securities that nationalize the Companies and entitle Treasury to 100% of their net worth as if Treasury were the outright owner of all common and preferred stock in the Companies. Treasury cannot evade this clear statutory restriction on its authority to purchase securities of the Companies by the simple expedient of calling these new securities an "amendment" to the old securities.

110.    In addition, before exercising its temporary authority to purchase securities, Treasury is required to "determine that such actions are necessary to . . . (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer." 12 U.S.C. § 1719(g)(1)(B). In making the statutorily required determinations, Treasury must consider such factors as "the [Companies'] plan[s] for the orderly resumption of private market funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," among other factors. *Id*. § 1719(g)(1)(C)(iii), (v).

39

111.     These statutory criteria must apply to any and all "amendments" to the Purchase Agreements. Were it otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired and effectively turn Treasury's limited, temporary grant of authority to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority and subvert the statutory limitations imposed by Congress.

112.     As far as the public record discloses, Treasury did not make any of the required determinations or consider any of the necessary factors before imposing the Net Worth Sweep. It therefore exceeded its statutory authority.

113.     The Net Worth Sweep is beyond Treasury's authority because it is not compatible with due consideration of factors that Treasury must consider before purchasing the Companies' securities or amending its agreements to purchase such securities. The Net Worth Sweep destroys the value of the Companies' private stock. The Net Worth Sweep is therefore wholly incompatible with "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and with the "orderly resumption of private market funding or capital market access."

114.     On information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury. But because HERA mandates that FHFA "shall not be subject to the direction or supervision of any other agency" when performing its duties as conservator for the Companies, 12 U.S.C. § 4617(a)(7), Treasury acted in excess of its authority in imposing its will on FHFA.

115.     Treasury's conduct was therefore outside of Treasury's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by

law," and Plaintiffs are therefore entitled to relief against Treasury pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT III

### Violation of the Administrative Procedure Act:
### Treasury's Conduct Was Arbitrary and Capricious

116.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

117.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This means, among other things, that agency action is unlawful unless it is the product of "reasoned decisionmaking" that considers every responsible alternative. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52. Decisionmaking that relies on inadequate evidence or that results in inconsistent or contradictory conclusions cannot satisfy that standard.

118.    Before Treasury exercises its temporary authority to purchase the Companies' securities, it is required to determine that the financial support is necessary to "provide stability to the financial markets," "prevent disruptions in the availability of mortgage finance," and "protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). In making these determinations, Treasury is further required to "take into consideration" several factors, including the "plan for the orderly resumption of private market funding or capital market access," and the "need to maintain [the] status [of Fannie and Freddie] as . . . private shareholder-owned compan[ies]." *Id.* §§ 1455(*l*)(1)(C); 1719(g)(1)(C).

119.    These statutory criteria plainly apply to any and all "amendments" of the Purchase Agreements. Were it otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired and effectively turn

41

Treasury's limited, temporary grant of authority to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority and subvert the statutory limitations imposed by Congress.

120.    There is no evidence in the public record that Treasury made the required determinations or considered the necessary factors before imposing the Net Worth Sweep. Indeed, the available evidence reveals that none of the necessary conditions was satisfied. Further, Treasury also has not explained whether it considered alternatives to the Net Worth Sweep that would have been both consistent with its statutory obligations and less harmful to Plaintiffs and other private shareholders. Treasury has thus arbitrarily and capriciously failed to provide a reasoned explanation for its conduct, which results in the Government's expropriation of all private shareholder value in the Companies' preferred and common stock.

121.    Treasury also arbitrarily and capriciously failed to consider alternatives to the Net Worth Sweep that would have better promoted stability in the mortgage markets by leaving the Companies on a sound financial footing. The Net Worth Sweep undermines the Companies' financial health by preventing them from building up cash reserves in one quarter that can be used to service debt in another quarter. Yet there is no evidence in the public record that Treasury considered alternatives to the Net Worth Sweep that would have provided greater assurance to investors that the Companies will be able to service their debts in the future.

122.    Treasury also acted in an arbitrary and capricious manner by failing to consider whether the Net Worth Sweep is consistent with its fiduciary duties to holders of preferred and common stock as the Companies' dominant shareholder.

123.    Under applicable state law governing shareholders' relationship with Fannie and with Freddie, a corporation's dominant shareholders owe fiduciary duties to minority shareholders.

124.    Treasury is the dominant shareholder and de facto controlling entity of the Companies. For example, Treasury serves as the Companies' only permitted source of capital, and Treasury must give permission to the Companies before they can issue other equity securities and before they can sell assets valued above $250 million. Treasury also is able to influence or control the actions of FHFA as conservator and the length and nature of the conservatorship.

125.    The Net Worth Sweep effectively transfers the value of the preferred and common stock from Plaintiffs and other private holders to the Companies' dominant shareholder. And as Treasury admits, the Net Worth Sweep's purpose is to wind down the Companies' operations. Treasury's actions in preventing Plaintiffs and other private shareholders from receiving any dividends or value from their stock, combined with Treasury's intent to wind down the Companies, render the private stock devoid of any value or prospect of return.

126.    Treasury's conduct was therefore arbitrary and capricious, and Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

## COUNT IV

### Breach of Contract Against FHFA as Conservator of Fannie and Freddie

127.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

128.    Holders of the Companies' preferred and common stock have certain contractual rights.  Preferred stockholders are entitled to a contractually specified, non-cumulative dividend and to a contractually specified liquidation preference.  The dividend and liquidation rights of

43

private preferred shareholders are prior to those of common shareholders. The Companies may not pay dividends or make distributions on account of its common stock in any quarter where dividends on preferred stock is not paid in full. Common shareholders are entitled to be paid dividends in parity with other common shareholders, and upon liquidation they are entitled to a share of the residual economic value of the firm after payment of debtholders and equity holders senior in priority to common stock.

129. By entering the Net Worth Sweep, FHFA, as conservator for Fannie and Freddie, breached the Companies' obligations to Plaintiffs by nullifying entirely Plaintiffs' contractual rights as holders of the Companies' stock. Thus, in addition to exceeding its authority as conservator under HERA, FHFA's agreement to the Net Worth Sweep breached or repudiated Fannie's and Freddie's contracts with Plaintiffs and other private shareholders.

130. Again, the Net Worth Sweep replaced the 10% dividend (if paid in cash) on Treasury's Government Stock with a perpetual requirement that the Companies pay their entire net worth to Treasury. Amounts in excess of the 10% cash dividend on the Government Stock would otherwise be available to pay dividends to private shareholders. The Net Worth Sweep thus strips the Companies of their ability to generate and retain funds to distribute as dividends to holders of preferred and common stock.

131. By essentially expropriating the entirety of the Companies' net worth for the government, the Net Worth Sweep also nullified entirely the contractual right of Plaintiffs and other holders of common and preferred stock to receive a payment upon the dissolution, liquidation, or winding up Fannie and Freddie.

132. In short, the Net Worth Sweep effectively eliminated all equity interests in the Companies other than Treasury's Government Stock.

133.     The Companies—and thus FHFA when acting as conservator for the Companies—is contractually prohibited from unilaterally changing the terms of preferred stock to materially and adversely the rights of preferred shareholders.  The Net Worth Sweep violates this prohibition by effectively eliminating the dividend and liquidation preference rights associated with the Companies' preferred stock.

134.     No provision of Plaintiffs' contracts with the Companies reserves to Fannie and Freddie any right to *repudiate* or *nullify entirely* the Companies' contractual obligations to Plaintiffs and other private shareholders by granting rights to another class of the Companies' stock.

135.     Furthermore, the Net Worth Sweep effectively transformed Treasury's Government Stock into 100% of the Company's common stock by granting Treasury the right to 100% of the Company's net worth.  The entitlement to receive all residual profit is the key attribute of common stock.  Paying dividends on this newly created common stock without first paying dividends to Plaintiffs and other holders of preferred stock violates those shareholders' contractual right to be paid a dividend in full in any quarter where the Companies pay a dividend on common stock. It also violates the rights of other common shareholders to share in common stock dividend distributions.

136.     FHFA has therefore both exceeded its statutory authority under HERA and breached the Companies' contracts with Plaintiffs and other private shareholders.

## COUNT V

**Breach of Implied Covenant of Good Faith and Fair Dealing Against FHFA as Conservator of Fannie and Freddie**

137.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

45

138.     Implicit in every contract is a covenant of good faith and fair dealing. The implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

139.     Holders of the Companies' preferred and common stock have certain contractual rights. Preferred stockholders are entitled to a contractually specified, non-cumulative dividend and to a contractually specified liquidation preference. The dividend and liquidation rights of private preferred shareholder are prior to those of common shareholders. The Companies may not pay dividends or make distributions on account of its common stock in any quarter where dividends on preferred stock is not paid in full. Common shareholders are entitled to be paid dividends in parity with other common shareholders, and upon liquidation they are entitled to a share of the residual economic value of the firm after payment of debtholders and equity holders senior in priority to common stock.

140.     FHFA's agreement to the Net Worth Sweep has arbitrarily and unreasonably prevented Plaintiffs and other private shareholders from receiving any of the fruits of their investment.  Again, the Net Worth Sweep replaced the 10% dividend on Treasury's Government Stock with a perpetual requirement that the Companies pay their entire net worth to Treasury. The Net Worth Sweep thus strips the Companies of their ability to generate and retain funds to distribute as dividends to Plaintiffs and other holders of preferred and common stock.

141.     The Net Worth Sweep also (a) subverts the priority rights of preferred shareholders by effectively transforming Treasury's Government Stock into common stock and requiring the Companies to pay dividends on that common stock without first paying dividends

46

on preferred stock, and (b) effectively replaces the Companies existing common stock with Treasury's Government Stock.

142.    By essentially expropriating the entirety of the Companies' net worth for the government, the Net Worth Sweep also nullified entirely the contractual right of Plaintiffs and other holders of common and preferred stock to receive a payment upon the dissolution, liquidation, or winding up of Fannie and Freddie.

143.    No provision of Plaintiffs' contracts with Fannie and Freddie reserves to the Companies any right to *repudiate* or *nullify entirely* the Companies' contractual obligations to Plaintiffs and other private shareholders by granting rights to another class of the Companies' stock.

144.    In sum, the Net Worth Sweep repudiates and nullifies entirely the scope, purpose, and terms of the contracts governing the relationships between Fannie and Freddie and their preferred and common shareholders.

145.    FHFA has therefore both exceeded its statutory authority under HERA and breached the implied covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

146.    WHEREFORE, Plaintiffs pray for an order and judgment:

a.    Declaring that the Net Worth Sweep, and its adoption, are not in accordance with and violate HERA within the meaning of 5 U.S.C. § 706(2)(C), and that Treasury acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) by executing the Net Worth Sweep;

b.    Vacating and setting aside the Net Worth Sweep, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

c. Enjoining Treasury and its officers, employees, and agents to return to FHFA as conservator of Fannie and Freddie all dividend payments made pursuant to the Net Worth Sweep or, alternatively, recharacterizing a portion of such payments as a pay down of the liquidation preference and a corresponding partial redemption of Treasury's Government Stock rather than mere dividends;

d. Enjoining FHFA and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

e. Enjoining Treasury and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

f. Enjoining FHFA and its officers, employees, and agents from acting at the instruction of Treasury or any other agency of the government and from re-interpreting the duties of FHFA as conservator under HERA;

g. Awarding Plaintiffs damages resulting from FHFA's breach of contract and breach of the implied covenant of good faith and fair dealing, including without limitation contractually-due dividends on the preferred and common stock for each quarter when a dividend based on the net worth of the Companies was paid to Treasury;

h. Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

i. Granting such other and further relief as this Court deems just and proper.

48

/s/ *Alexander M. Johnson*

Alexander M. Johnson, AT0004024
Sean P. Moore, AT0005499

BROWN, WINICK, GRAVES, GROSS,
BASKERVILLE AND SCHOENEBAUM, P.L.C.
666 Grand Avenue, Suite 2000
Des Moines, IA 50309-2510
Telephone:  515-242-2400
Facsimile:   515-283-0231
E-mail:  ajohnson@brownwinick.com
        moore@brownwinick.com

ATTORNEYS FOR PLAINTIFFS

49